Max Weiner et al., Appellees *v.* Southeastern Pennsylvania Transportation Authority, Appellant.

98

Argued July 8, 1980, before President Judge CRUMLISH and Judges MACPHAIL and WILLIAMS, JR., sitting as a panel of three.

*Lewis H. Van Dusen, Jr.,* with him *Raymond K. Denworth, Jr., Nancy Sarah Cohen and James C. Ingram, Drinker, Biddle & Reath,* for appellant.

*Max Weiner,* with him *George D. Gould, John F. Street and David Cohen,* for appellees.

Opinion by President Judge Crumlish, July 8, 1980:

Before us is the appeal of the Southeastern Pennsylvania Transportation Authority (SEPTA). The Philadelphia Common Pleas Court enjoined the implementation of tariffs containing increases in fares voted by SEPTA'S Board on June 25, 1980, and scheduled to be effective at 12:01 a.m. on July 1, 1980. We affirm the Court below until the convening of the SEPTA Board meeting as mandated by our Legislature and dictated by the corresponding Order of this Court.

After hearings were held on five consecutive nights in May of 1980 in Philadelphia, Norristown, Upper Darby, and Levittown to evaluate proposed tariffs affecting the City Transit, Red Arrow, Frontier, and Commuter Rail Division fares, increases were recommended and passed by vote of a majority of the SEPTA Board. The two City of Philadelphia representatives and one Delaware County representative expressly voted "no" to the rate proposal, however, in addition to voting "no" one of the City representatives expressly rejected the motion that he was exercising a "veto" of the fare increase.

Citizen plaintiffs opposing the fare increase then filed a complaint in equity and a motion for special injunction, contending that the casting of *negative* votes by the three Board members representing one-third of the population was tantamount to a "veto" of the tariff under Section 18(a) of the Metropolitan Transportation Authorities Act of 1963,[1] which by leg-

---

[1] Act of August 14, 1963, P.L. 984, *as amended*, 66 P.S. §2018(a), provides that SEPTA Board votes are controlled as follows:

(a) . . . All action of the Board shall be by resolution and the affirmative vote of a majority of all the members shall be necessary for the adoption of any resolution:

islative process may be overriden by a subsequent vote of three-quarters of the Board.

SEPTA argues that majority rule may be vetoed only by express objection made specifically as provided in Section 18(a) which requires a more specific rejection of the proposition. Moreover, SEPTA argues that it has the authority to ordain such rules and practices as its specific needs require, one consistent practice being that there is a recognized distinction between positive-negative and veto vote castings.

The Court below in finding that the Board had committed a manifest and flagrant abuse of discretion in its interpretation and application of Section 18(a), entered the requested injunctive order, and remanded the matter back to SEPTA[2] in order to allow the

---

> *Privided, however, That no action by the board* to which an *express objection* has been made, pursuant to this section, *by* a *board member* or *members representing* a county or counties having *one-third or more of the population* of the metropolitan area, as determined by the most recent decennial census, *shall be carried unless supported at a subsequent regular meeting of the board by the votes of at least three-quarters of the membership of the board.* (Emphasis added.)

[2] Section 4(d)(9) of the Act, 66 P.S. §2004(d)(9) not only provides the Board with the authority to determine rates to be charged for service, but enumerates an objecting citizen's rights and the court's corresponding responsibility:

> Any person aggrieved by any rate . . . fixed by the authority may bring an appeal . . . in the court of common pleas . . . for the purpose of protesting . . . such charge. . . . Provided, however, that the grounds for such suits shall be restricted to a manifest and flagrant abuse of discretion or an error of law; otherwise all such actions shall be final. *Upon the finding of an error of law or a manifest and flagrant abuse of discretion, the court shall issue an order setting forth the abuse or error and returning the matter to the authority for such further action as shall be not inconsistent with the findings of the court.* (Emphasis added.)

required subsequent regular meeting of the Board to determine the fate of the fare increase.

We need only determine whether the lower court erred, either in fact or law, or abused its discretion in finding that the SEPTA Board had flagrantly and manifestly abused its discretion by considering the three-members' "no" votes a "veto".

Resolution of the issue requires a two-fold consideration:

(1) a clear definition of the term "express objection", and

(2) an interpretation of the statute.

Section 18(a), summarized, provides that an "express objection" by representatives of *one-third* of the population requires a subsequent Board meeting wherein three-quarters of the Board's membership must vote to affirm the fare increase. We get little guidance from the statute in seeking to define "express objection", however, considering it in context and the current practicalities, we must conclude that "no" is an "express objection". Indisputably, a "no" vote means "against" while a "yes" vote means "for" a proposition. In our judgment, "no" is one end of the pole as "yes" is at the other end. Regardless of variations in shading, the result found at the end of the pole is clear. It is either yes (for) or no (against).

When these three Board members registered "no" to the proposed fare increase, they registered an "express objection", regardless of whether one or all sought to qualify their decision. Notwithstanding the City Representative's attempt to qualify his vote as not contemplating a "veto", it remained a mere appendage to the substantive decision to express his personal opposition to the proposal.

Consequently, when the three board members voted "no", the "veto" provision, as it has come to be called,

was activated, requiring a subsequent supporting vote by three-quarters of the Board prior to effecting the increase.

Though a case of first impression, this Court, speaking through Judge ROGERS, in *Stoltz v. McConnon*, 26 Pa. Commonwealth Ct. 82, 92, 362 A.2d 1121, 1125 (1976), *aff'd* 473 Pa. 157, 373 A.2d 1096 (1977), analyzed Section 18(a)'s "veto" provision:

> *Reading the whole of 18(a), we find that representatives of municipalities having populations equal to one-third of the population of all of the constituent members may veto a resolution adopted by SEPTA and that this veto may not be overridden except by the vote of three-fourths of the membership of the board—or eight members.* This provision was, of course, intended to protect Philadelphia which had generously agreed to equal representation with the less populated counties. The requirement of six affirmative votes to adopt resolution, we believe was intended to protect members not given this right of veto. These municipalities were afforded the protection of the requirement that at least six votes be recorded for any resolution they opposed and in particular, in the case of the two smallest counties, that at least one vote against them would have to come from each of the other of the three municipalities. Section 18(a) was a sophisticated attempt to accomplish voting fairness to the diverse interests, capabilities and transit requirements of all its members. (Emphasis added.)

Even for the sake of argument if the qualified negative expression is to be considered a "veto", the result must be the same.

Section 18(a)'s "veto" provision seeks "to balance and accommodate the diverse interests of the

various counties participating in the authority and to assure that authority action have a broad base of affirmative suport". *Stoltz v. McConnon,* 473 Pa. at 167, 373 A.2d at 1100-01, and this broad base of support requires a three-quarters vote by the Board.

Section 18(a) provides that the three-quarters membership vote take place at a "subsequent regular meeting of the board". While July is not a "regular meeting" month,[3] there is no legislative proscription which would prohibit the calling of a special meeting in July to consider significant matters requiring early decision. *See* Sections 3.02 and 3.03 of the SEPTA By-Laws. This Court in the interest of justice dictated by the facts in this case has indeed the authority to order the holding of a special meeting of the Board. Because of the widespread confusion among the Board membership as to their responsibilities and authority, a failure to understand the legal incidents of their votes and the incipient indecision, delay and the adverse effect upon the citizens who are served by SEPTA, we are constrained to

## Order

The order of the Court of Common Pleas of Philadelphia County dated June 30, 1980, granting a supersedeas is hereby affirmed, and the Chairman of the Board of SEPTA is directed to hold the necessary meeting of its Board no later than 2:00 p.m. EDST, July 11, 1980, and by a vote of three-quarters of the members of the Board to determine the sole issue of tariff implementation containing fare increases pro-

---

[3] Section 18(a), 66 P.S. §2018(a) provides:

Regular meetings of the board shall be held in the metropolitan area at least once in each calendar month *except July* or August, the time and place of such meetings to be *fixed by the board.* (Emphasis added.)

while SEPTA's By-Laws allow special meetings to be called at any time. *See* SEPTA By-Law Section 3.03.

posed at the regular June, 1980, meeting; and to report the results thereof to this Court forthwith and without further delay.

---

DISSENTING OPINION BY JUDGE MacPHAIL:

I respectfully dissent.

In my opinion, the vote by SEPTA member Beetle was not an objection under Section 18(a) of the Act as interpreted by this Court in *Stoltz v. McConnon*, 26 Pa. Commonwealth Ct. 82, 362 A.2d 1121 (1976), *aff'd* 473 Pa. 157, 373 A.2d 1096 (1977).